# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| BAYCO PRODUCTS, INC. | § | |
| | § | |
| v. | § | Civil Action No.  4:19-CV-00648-ALM |
| | § | Judge Mazzant |
| PROTORCH COMPANY, INC.,  SUZHOU | § | |
| PROTORCH CO., LTD.,  TIM GOETZ & | § | |
| ASSOCIATES LLC, HONG HUANG | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendants ProTorch Company, Inc. ("ProTorch U.S."), Suzhou ProTorch Co., Ltd. ("ProTorch China"), Tim Goetz & Associates LLC ("Goetz & Associates"), and Hong Huang also known as Henry Huang's ("Huang") (collectively, "Defendants") First Amended Motion to Dismiss the Case and Compel Arbitration (Dkt. #37). Having considered the motion and the relevant pleadings, the Court finds that the motion should be granted.

## BACKGROUND

### I.    Factual Background

As early as 2003, Plaintiff Bayco Products, Inc. established a relationship with Changshu Minghui Appliance Co., Ltd. ("Minghui"), a Chinese manufacturer (Dkt. #33 ⁋ 29).  Plaintiff's business involves providing a vast array of portable and corded lighting products (Dkt. #33 ⁋ 14), and Plaintiff used Minghui as an Original Equipment Manufacturer ("OEM") for several of Plaintiff's products (Dkt. #33 ⁋⁋ 21, 29).  The President and owner of Minghui is Huang, who is also a majority owner of ProTorch China and ProTorch U.S. (Dkt. #33 ⁋⁋ 34, 36, 39).

On March 31, 2010, Plaintiff and Minghui entered into an OEM Agreement (Dkt. #33 ⁋ 32).  As alleged by Plaintiff, the "OEM Agreement expressly stated that Minghui's (or Minghui's

Affiliates) will not sell, market, or solicit orders regarding the OEM Products in any market . . ." (Dkt. #33 ⁋ 33).   Indeed, Plaintiff asserts that "the selling or provision of OEM Products by Minghui's (or Minghui's Affiliates) to any third party are unauthorized sales or marketing, especially any sale of similar products to Bayco's existing or prospective customers" (Dkt. #33 ⁋ 33).

Plaintiff alleges that ProTorch China receives manufactured goods from Minghui and then represents itself as the OEM for products used, sold, imported, and offered for sale by ProTorch U.S. (Dkt. #33 ⁋ 43).   Specifically, Plaintiff claims that ProTorch U.S. and ProTorch China sell various electronic portable lighting products, retractable cord reels/reels and lightbulb changer kits in the United States, particularly to Lowe's Companies, Inc. ("Lowe's") (Dkt. #33 ⁋ 41).   ProTorch U.S. and ProTorch China's relationship with Lowe's is how the last defendant, Goetz & Associates, comes into play.

Plaintiff previously employed Tim Goetz as its National Accounts Manager during July 1998 through December 2005 (Dkt. #33 ⁋ 43).   According to Plaintiff, one of Mr. Goetz's key accounts when he worked for Plaintiff was Lowe's (Dkt. #33 ⁋ 43).   It appears that Mr. Goetz formed a company, Goetz & Associates, after Plaintiff terminated Mr. Goetz (Dkt. #33 ⁋ 44). Plaintiff used Goetz & Associates as a manufacturer's representative after signing a Manufacturer's Representative Agreement ("MRA") effective January 1, 2006 (Dkt. #33 ⁋ 44). According to Plaintiff, Goetz & Associates breached the MRA's NDA and secured a sales contract between ProTorch U.S. and Lowe's related to ProTorch products (Dkt. #33 ⁋ 48).   In fact, Plaintiff repeatedly refers to Goetz as an agent of Defendant ProTorch U.S. and Defendant ProTorch China in its complaint (Dkt. #33 ⁋⁋ 82, 84, 128–31, 134, 136–37).

Plaintiff asserts federal and common-law trademark infringement, federal and common-law unfair competition, and federal trade dress infringement against ProTorch U.S., ProTorch China, and Huang (Dkt. #33).  Plaintiff asserts violation of the Texas Uniform Trade Secrets Act and violation of the Defend Trade Secrets Act against all Defendants (Dkt. #33).  Plaintiff also has two breach of contract claims: Plaintiff alleges that Huang is liable for breach of the "Business Secret" Section of the March 31, 2010, OEM Agreement between Minghui and Plaintiff, and Plaintiff alleges that Goetz breached his duty under the "Confidential Information" Section of the January 1, 2006, MRA between Goetz and Plaintiff (Dkt. #33).

## II.   The OEM Agreement

Plaintiff and Minghui entered into an OEM Agreement on March 31, 2010, where Minghui agreed to "manufacture various electronic portable lighting products (OEM products)" for Plaintiff (Dkt. #33 ¶ 32; Dkt. #33, Exhibit 6).  Several provisions of the OEM Agreement are relevant to Defendants' Motion to Dismiss the Case and Compel Arbitration.

The OEM Agreement defines Minghui as "Party A" and Plaintiff as "Party B" (Dkt. #33, Exhibit 6).  The OEM Agreement also contemplates actions taken by Minghui's affiliates in performance of the OEM Agreement:

> Party A's affiliates mentioned in this agreements [sic] refer to other enterprises, organizations or individuals associated with Party A including but not limited to its factories, organs, subsidiaries, etc. according to China's existing tax laws, regulations and files.

(Dkt. #33, Exhibit 6 ¶ 1.6).  The OEM Agreement then provides that Minghui "will not sell into, solicit orders from, nor market (either passively or actively) OEM products into any market worldwide" (Dkt. #33, Exhibit 6 ¶ 5.3).  The OEM Agreement explicitly lists the following acts as unauthorized sales or marketing:

5.3.1 Manufacture OEM products beyond purchase orders;

3

5.3.2 Sell or provide OEM products to any third party through methods including but not limited to below:
5.3.2.1 directly;
5.3.2.2 via trading company;
5.3.2.3 via distributor;
5.3.2.4 via Party B's customer; or
5.3.2.5 via bidding auctions and trade shows
5.3.3 Express that it holds the right to sell or as an agent of Party B;
5.3.4 Authorize any third party to sell or as its/Party B's agent to sell the OEM products.
5.3.5 Sell products similar in design, form, shape or function to Party B's existing or prospective customers.

(Dkt. #33, Exhibit 6).  And the OEM Agreement provides that:

article 5.3 in this chapter shall bind Party A's affiliates.  Party A or its affiliates shall stop infringements (if any) upon receiving written notification from Party B and be liable for breach of agreement as well as pay compensation to Party B.

(Dkt. #33, Exhibit 6 ⁋ 5.4).  Minghui is also liable for "breach of contract if Party A or Party A's affiliates infringe the agreement."  (Dkt. #33, Exhibit 6 ⁋ 9.4.2).

The OEM Agreement's arbitration clause reads as follows:

Any dispute should firstly be negotiated to be resolved between both parties.  In case any negotiation fails, the dispute shall be submit [sic] to CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION, SHANGHAI COMMISSION.

(Dkt. #33, Exhibit 6 ⁋ 10.1).  The only signatories to the OEM Agreement are Minghui and Plaintiff (Dkt. #33, Exhibit 6).

## III.   Procedural History

### A.   Proceedings Before the Court

Plaintiff filed suit on September 9, 2019 (Dkt. #1).  On December 31, 2019, Defendants filed their first Motion to Dismiss the Case (Dkt. #20).  Defendants also filed a Motion to Stay Case Pending Resolution of Defendants' Motion to Compel Arbitration and Dismiss on February 3, 2020 (Dkt. #25).  Plaintiff filed an Amended Complaint on March 20, 2020 (Dkt. #33).

On April 10, 2020, Defendants filed their First Amended Motion to Dismiss the Case and Compel Arbitration (Dkt. #37).  Plaintiff responded on April 17, 2020 (Dkt. #38).[1]  Defendants filed their reply on April 24, 2020; Plaintiff filed its sur-reply on April 27, 2020 (Dkt. #45; Dkt. #46).  The Court heard argument regarding Defendants' First Amended Motion to Dismiss on May 12, 2020 (Dkt. #51).[2]

### B.  Simultaneous Arbitration Proceedings

Interspersed with the proceedings before the Court are several arbitration proceedings.  On December 6, 2019—after negotiating with Plaintiff pursuant to the OEM Agreement's arbitration clause—Minghui, ProTorch China, and ProTorch U.S. filed an arbitration petition in the Shanghai International Economic and Trade Arbitration Commission ("SHIAC") (Dkt. #37 at p. 10). SHIAC instituted the arbitration the same day (Dkt. #37 at p. 10).  Minghui, ProTorch China, and ProTorch U.S. later submitted supplemental arbitration requests to SHIAC that they claim encompass all of Plaintiff's claims in this lawsuit (Dkt. #37 at p. 10).  SHIAC's arbitration tribunal was formed on February 17, 2020, and it accepted all of the supplemental arbitration requests the following week (Dkt. #37 at p. 10).  As both parties represented to the Court during the May 12, 2020 hearing, SHIAC scheduled a hearing for this arbitration on June 6, 2020 (Dkt. #52).

Plaintiff also filed an arbitration petition against Minghui in SHIAC on February 28, 2020 (Dkt. #37 at p. 11).  SHIAC instituted the arbitration filed by Plaintiff (Dkt. #37 at p. 11).  As both parties represented to the Court during the May 12, 2020 hearing, SHIAC also scheduled a hearing for this arbitration on June 6, 2020 (Dkt. #52).

---

[1] Plaintiff also filed an Emergency Motion for Anti-Suit Injunction Against Defendants Proceeding with Chinese Arbitration the same day (Dkt. #39).  The Court ordered expedited briefing (Dkt. #40).  Defendants responded to the Emergency Motion on April 22, 2020 (Dkt. #41).  Plaintiff filed its reply on April 24, 2020 (Dkt. #44).

[2] The Court also heard argument regarding Plaintiff's Emergency Motion for Anti-Suit Injunction the same day (Dkt. #51).

## LEGAL STANDARDS

Defendants seek dismissal—or alternatively, a stay pending arbitration—of this suit based on an arbitration clause under either Rule 12(b)(1) or Rule 12(b)(3) (Dkt. #37 at p. 11).

### I.   Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

## II.    Federal Rule of Civil Procedure 12(b)(3)

Federal Rule of Civil Procedure 12(b)(3) allows a party to move to dismiss an action for "improper venue." FED. R. CIV. P. 12(b)(3).  Once a defendant raises improper venue by motion, "the burden of sustaining venue will be on [the] Plaintiff."  *Cincinnati Ins. Co. v. RBP Chem. Tech., Inc.*, No. 1:07-CV-699, 2008 WL 686156, at *5 (E.D. Tex. Mar. 6, 2008).  "Plaintiff may carry this burden by establishing facts that, if taken to be true, establish proper venue."  *Id.* (citations omitted).  The Court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff.  *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:16-CV-459, 2014 WL 978685, at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)).

In determining whether venue is proper, "the Court may look beyond the complaint to evidence submitted by the parties."  *Ambraco*, 570 F.3d at 238.  If venue is improper, the Court must dismiss, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a); FED. R. CIV. P. 12(b)(3).

## ANALYSIS

## I.    The Convention on the Recognition and Enforcement of Foreign Arbitral Awards

In 1970, the United States accented to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention").  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (citing Convention Done at New York, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38).  The Convention was implemented that same year via amendment to the Federal Arbitration Act ("FAA").  *Id.* (citing Pub. L. No. 91–368, 84 Stat. 692 (July 31, 1970) (codified at 9 U.S.C. §§ 201–208)).  "The Convention's implementing legislation incorporates the entire FAA, at least to the extent that the FAA does not conflict with the Convention."  *Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329, 332

(5th Cir. 2010) (citing 9 U.S.C. § 208; *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 20 (2d Cir. 1997)).

The parties agree that the arbitration clause in the OEM Agreement is governed by the Convention (Dkt. #37 at p. 12; Dkt. #38 at p. 6).  "If an international arbitration clause falls under the Convention Act, 'the Convention requires district courts to order arbitration.'"  *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 903 (5th Cir. 2005) (quoting *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat. Oil Co.*, 767 F.2d 1140, 1145 (5th Cir. 1985)) (citing 9 U.S.C. § 201). Determining whether the Convention requires compelling arbitration in a given case is a "very limited inquiry."  *Freudensprung v. Offshore Tech. Services, Inc.*, 379 F.3d 327, 339 (5th Cir. 2004) (citation omitted).  So, a Court should compel arbitration if: "(1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen."  *Id.* (internal quotation omitted) (citation omitted).  Once these four requirements are met, the Court must order arbitration unless the Court finds that the agreement is null and void, inoperative, or incapable of being performed.  *Id.* (quoting *Sedco*, 767 F.2d at 1146). Essentially, this analysis goes to the validity of the arbitration clause.

But the question here is not whether a valid arbitral clause was formed under the Convention, which neither party disputes (Dkt. #37 at p. 12; Dkt. #38 at p. 6).  The two questions here concern the scope of the arbitration clause: (1) whether the scope of the clause covers these parties—Plaintiff, who is a signatory to the OEM Agreement, and Defendants, who are non-signatories; and (2) whether the scope of the clause covers Plaintiff's asserted causes of action. For that analysis, the Court looks to the intent of the parties "as expressed in the terms of the

agreement" and to "background principles of state contract law . . . ."  *See Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*, 866 F.3d 709, 715 (5th Cir. 2017) (quotations omitted).

## II.   Defendants May Compel Arbitration

"[W]here a contract contains an arbitration clause, there exists a strong presumption that arbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'"  *Phillips Petroleum Co. v. Marathon Oil Co.*, 794 F.2d 1080, 1081 (5th Cir. 1986)).  "[T]he federal policy favoring arbitration 'applies with special force in the field of international commerce.'"  *Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 275 (5th Cir. 2002) (quoting *Mitsubishi Motors*, 473 U.S. at 631).

Here, two independent reasons exist to compel arbitration.  First, "[w]ho is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement."  *Brittania-U*, 866 F.3d at 715 (quotation omitted) (alteration in original).  Plaintiff—a signatory to the OEM Agreement—contemplated that as affiliates of Minghui, Defendants would not only comply with the OEM Agreement but would be held accountable for violations of the OEM Agreement.  So, the arbitral clause itself is susceptible of an interpretation that covers the parties at issue.  And the arbitration clause in the OEM Agreement contemplates that "any dispute . . . shall be submit[ted]" to arbitration.  There could hardly be "broader general language" than the "any dispute" language found in the OEM Agreement's arbitration clause.  *See Sedco*, 767 F.2d at 1145 (quoting *Caribbean Steamship Co. v. Sonmez Denizcilik Ve Ticaret*, 598 F.2d 1264, 1266 (2d Cir. 1979)).  Because the arbitral clause itself is readily susceptible of an

interpretation that covers both the parties and the disputes at issue, arbitration must be compelled on this ground alone.

The second, independent ground to compel arbitration here is that under either a direct-benefits estoppel or an intertwined-claim estoppel theory, non-signatory Defendants can compel arbitration under the OEM Agreement. While the Supreme Court of the United States is set to decide whether the Convention permits a non-signatory to an arbitration agreement to compel arbitration based on the doctrine of equitable estoppel, see *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 139 S. Ct. 2776 (2019), the current law in the Fifth Circuit permits non-signatories to use estoppel theories to enforce arbitration clauses under the Convention. *Cf. Brittania-U*, 866 F.3d at 715 (explaining that when presented with an arbitral clause governed by the Convention without a delegation-of-arbitrability clause, a court would determine whether a contract can be enforced "by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel."); *Todd*, 601 F.3d at 333–35, 334 nn.10–11. Unless the Supreme Court or the en banc Fifth Circuit overrules this line of cases, the Court is bound to faithfully apply the law. *See, e.g.*, *Billiot v. Puckett*, 135 F.3d 311, 316 (5th Cir. 1998). And an application of the estoppel theories argued by Defendants shows that Defendants may properly compel arbitration of this dispute.[3]

### A. The Arbitration Clause's Plain Language

"[I]t is the language of the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (citation omitted). And—consistent with the general rule—the Fifth Circuit has recognized in a Convention case that "whenever the scope

---

[3] Because the Court finds that it must compel arbitration, it will not reach Defendants' argument for dismissal under Rule 12(b)(6).

of an arbitration clause is in question, the court should construe the clause in favor of arbitration."

*Sedco*, 767 F.2d at 1145 (citation omitted).

The OEM Agreement's arbitration clause is both simple and broad:

> Any dispute should firstly be negotiated to be resolved between both parties.  In case any negotiation fails, the dispute shall be submit [sic] to CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION, SHANGHAI COMMISSION.

(Dkt. #33, Exhibit 6 ¶ 10.1).  In order for Defendants to be able to compel arbitration under the terms of the OEM Agreement, the Court must answer two questions: (1) were Defendants—as agents or affiliates of Minghui—intended to be covered by the arbitration clause; and (2) are Plaintiff's claims here covered by the scope of the arbitration clause.  The Court finds that the answer to both is, "yes."  Thus, under a plain reading of the OEM Agreement's arbitration clause, the Court grants Defendants' motion to compel arbitration.

### i.    The Clause Covers Defendants, Who Are Minghui's Affiliates

As Defendants argue, the plain language of the OEM Agreement evinces that Defendants were intended to be covered by the arbitration clause (Dkt. #37 at p. 15; Dkt. #45 at p. 3).  The OEM Agreement contemplates Minghui's affiliates having a major role in the performance of producing the OEM products—so much so that "Party A's affiliates" is a defined term (Dkt. #33, Exhibit 6 ¶ 1.6).[4]  The OEM Agreement explicitly prohibits Minghui and Minghui's affiliates from engaging in unauthorized sales or marketing (Dkt. #33, Exhibit 6, ch. V).  The OEM Agreement explicitly makes Minghui's affiliates liable to Plaintiff for any infringements of the Agreement (Dkt. #33, Exhibit 6 ¶ 5.4).  And the OEM Agreement even makes Minghui liable for breach of contract if Minghui *or Minghui's affiliates* infringe the agreement (Dkt. #33, Exhibit 6 ¶ 9.4.2).  The OEM Agreement clearly "bind[s]" Minghui's affiliates and requires Minghui's affiliates to

---

[4] Minghui is "Party A" under the OEM Agreement.

perform in accordance with the Agreement's terms (Dkt. #33, Exhibit 6 ℙ 5.4).  The question now is, does the arbitration clause in that same Agreement bind Minghui's affiliates.  Unless the text of the arbitration clause is incapable of an interpretation that would cover Minghui's affiliates, Minghui's affiliates are covered by the clause.  *See Phillips Petroleum Co.*, 794 F.2d at 1081.  But in interpreting the arbitration clause, the Court may not "reach a result inconsistent with the plain text of the contract . . . ."  *Waffle House, Inc.*, 534 U.S. at 294.

The OEM Agreement's arbitration clause consists of two distinct sentences.  First, it provides that "[a]ny dispute should firstly be negotiated to be resolved between both parties" (Dkt. #33, Exhibit 6 ℙ 10.1).  Next, it directs that, "[i]n case any negotiation fails, the dispute shall be" submitted to arbitration (Dkt. #33, Exhibit 6 ℙ 10.1).  The first sentence is better read to contemplate that Plaintiff and Minghui alone are required to negotiate any dispute, rather than Plaintiff and Minghui's affiliates.  The clause refers to "both parties," not "all parties"—the former better contemplates that only Plaintiff and Minghui are required to negotiate "any dispute."  *See Both*, Oxford English Dictionary (3d ed. 2016) ("With reference to two things, people, or groups previously specified: the two (without exception); the one as well as the other.").  This reading is further reinforced by the termination provision of the OEM Agreement, which allows termination if the "parties have so agreed" (Dkt. #33, Exhibit 6 ℙ 9.2.1).  The Court finds it highly unlikely that a valid termination could occur if one of Minghui's affiliates agreed with Plaintiff to terminate the OEM Agreement without Minghui's agreement.  Nor could Defendants persuade the Court otherwise when asked about the proper interpretation of the word "parties" at the May 12 hearing. The Court finds that "both parties" under the plain text of the contract refers to Plaintiff and Minghui, not Plaintiff and Minghui's affiliates.

Yet that is not the sentence compelling arbitration.  This first sentence only requires an initial *negotiation* in the event of a dispute.  It is the second sentence that compels arbitration if the negotiation between Plaintiff and Minghui fails to resolve the dispute.  And this sentence is broad enough to encompass and bind Minghui's affiliates.  Indeed, "[i]n case any negotiation fails" on "*any dispute*," the dispute "shall be" submitted to arbitration.  (Dkt. #33, Exhibit 6 ⁋ 10.1) (emphasis added).  As Defendant correctly points out, Minghui's affiliates played an indispensable role in Minghui's performance of the OEM Agreement, something that the terms of the Agreement make clear (Dkt. #37 at p. 16).  The OEM Agreement not only binds Minghui affiliates at several points in the contract, but it explicitly makes *Minghui's affiliates* directly liable to Plaintiff in the event that the affiliates breach their obligations under the Agreement.  The arbitration clause contemplates that any dispute will be submitted to arbitration.  The plain language of the clause displays the parties' intent that Minghui's affiliates be bound by the arbitration clause, just as Minghui's affiliates are bound to other provisions of the OEM Agreement.[5]

Plaintiff disagrees, quoting primarily from a Supreme Court of Texas case, *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185 (Tex. 2007).  Plaintiff cites the proposition from *Merrill Lynch* that "arbitration agreements generally do not apply to all corporate affiliates."  235 S.W.3d at 191.  True.  But the key word is "generally."  The arbitration clause in the OEM Agreement does not apply to Minghui's affiliates under the operation of some (nonexistent) general rule that affiliates may always enforce arbitration clauses—it applies because the intent of the parties, as

---

[5] The fact that only Plaintiff and Minghui—and not Plaintiff and Minghui's affiliates—are tasked with negotiating disputes before proceeding to arbitration does not counsel against this conclusion.  In fact, this requirement fits with the structure of the OEM Agreement.  Not only are Minghui's affiliates liable to Plaintiff under the OEM Agreement, but Minghui *itself* is liable to Plaintiff for any of the affiliate's breaches.  And ostensibly, Minghui would have some level of control or influence over its affiliates' actions, meaning Minghui could try and correct an affiliates' breach of the OEM Agreement.  So, the fact that Plaintiff and Minghui must first try to negotiate a global resolution of all disputes does nothing to undermine the conclusion that the arbitration clause contemplates that any dispute between Plaintiff and Minghui's affiliates must be submitted to arbitration.

expressed by the plain language of the OEM Agreement, compels arbitration of any dispute involving either Minghui or Minghui's affiliates.

As Plaintiff also correctly identifies, parties typically "shape [arbitration] agreements to their liking by specifying with whom they will arbitrate . . . ." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019).  Plaintiff did not "shape" the OEM Agreement to exclude Minghui's affiliates from the command that "any dispute . . . shall be" submitted to arbitration—a command found within an agreement that discusses Minghui's affiliates, binds Minghui's affiliates, and makes Minghui's affiliates liable to Plaintiff for any breach.  *Cf. In re Merrill Lynch*, 235 S.W.3d at 191 (explaining that where Merrill Lynch's cash-management agreements "referred to some affiliates and third parties, but not [affiliates] ML Trust or ML Life," which had their own contracts with the plaintiffs devoid of any arbitration clause, neither ML Trust nor ML Life could compel arbitration).  The arbitration clause does not bind Minghui's affiliates simply *because* they are affiliates of Minghui.  Rather, the plain language of the OEM Agreement shows an intent to bind Minghui's affiliates to the arbitration clause.  And the fact that Plaintiff—a signatory to the OEM Agreement—is now seeking to avoid the Agreement's arbitration clause because it does not explicitly mention Minghui's affiliates further weakens Plaintiff's position.  *Cf. Brittania-U*, 866 F.3d at 714–15 (analyzing *Contec Corporation v. Remote Solution, Co.*, 398 F.3d 205, 211 (2d Cir. 2005)) (holding that an arbitration clause's delegation of arbitrability to the arbitrator applied to two non-signatories—despite the clause's silence regarding whether it binds non-signatories— in large part because the party seeking to avoid arbitration was a signatory whose expectation and intent was to proceed with arbitration).

Further, Defendants here are all Minghui's affiliates under the terms of the OEM Agreement.   Minghui's affiliates refers "to other enterprises, organizations or individuals

associated with [Minghui] including but not limited to its factories, organs, subsidiaries, etc. according to China's existing tax laws, regulations and files" (Dkt. #33, Exhibit 6 ¶ 1.6).  Plaintiff does not refute Defendants' contention that Plaintiff expressly admitted in its arbitration petition with SHIAC that Defendant ProTorch U.S. and Defendant ProTorch China are Minghui's affiliates (Dkt. #37 at p. 8).  Nor does Plaintiff dispute the fact that Defendant ProTorch U.S. and Defendant ProTorch China share the same management team as Minghui and are under the direct control of Defendant Huang and Minghui in terms of capitals, operations, purchases, and sales (Dkt. #37 at p. 15).

In fact, it does not appear to the Court that Plaintiff seriously disputes whether Defendants are Minghui's affiliates for purposes of the OEM Agreement except for Goetz & Associates, which Plaintiff labels an independent contractor (Dkt. #38 at p. 4).[6]  However, Plaintiff identified Goetz & Associates as an agent of Defendant ProTorch U.S. and Defendant ProTorch China in Plaintiff's Amended Complaint (Dkt. #33 ¶¶ 5, 82).  And as addressed above, both Defendant ProTorch U.S. and Defendant ProTorch China are Minghui's affiliates.  Accordingly, the Court finds that by Plaintiff's own pleading, Goetz & Associates is one of Minghui's affiliates for purposes of the OEM Agreement.

---

[6] Plaintiff does spend time discussing alter-ego liability to contend that "[t]here is no dispute that in the eyes of the law, separate corporate entities and individual owners thereof may not be treated as 'one and the same' as each other, however otherwise 'related' or 'affiliated' they may be to each other, absent alter ego liability" (Dkt. #46 at pp. 1–2). But just like Plaintiff's argument that "generally," arbitration agreements do not apply to all corporate affiliates, this argument misses the mark—and for the same reason.  Defendants do not assert that they may compel arbitration by virtue of being Minghui's affiliates in a vacuum.  The OEM Agreement *explicitly* defines, binds, and makes Minghui's affiliates liable to Plaintiff for breaching the Agreement.  It is on this basis—the plain language of the Agreement, which evinces the parties' intent that Minghui's affiliates be covered by the arbitration clause—that Defendants may compel arbitration here.  It is not, as Plaintiff's argument would suggest, on the basis of some general corporate affiliation.

### ii.    The Clause Covers Plaintiff's Claims

Having determined that the plain language of the OEM Agreement's arbitration clause applies to all Defendants, the Court turns to whether the scope of the arbitration clause is broad enough to cover all of Plaintiff's claims.  The Court finds that it is.

Plaintiff asserts federal and common-law trademark infringement, federal and common-law unfair competition, and federal trade dress infringement against ProTorch U.S., ProTorch China, and Huang (Dkt. #33).  Plaintiff asserts violation of the Texas Uniform Trade Secrets Act and violation of the Defend Trade Secrets Act against all Defendants (Dkt. #33).  Plaintiff also has two breach of contract claims: Plaintiff alleges that Huang is liable for breach of the "Business Secret" Section of the March 31, 2010, OEM Agreement between Minghui and Plaintiff, and Plaintiff alleges that Goetz breached his duty under the "Confidential Information" Section of the January 1, 2006, MRA between Goetz and Plaintiff (Dkt. #33).  Despite only asserting one breach of the OEM Agreement, the broad scope of the arbitration clause covers the remainder of Plaintiff's claims.

There is no argument from Plaintiff that the "any dispute" language in the arbitration clause makes the scope of the clause broad.  Indeed, there could hardly be "broader general language" in an arbitration clause.  *See Sedco*, 767 F.2d at 1145.  But Plaintiff asserts that because it chose to sue not on the contract, but rather on other sources of obligation, the scope of the clause does not cover any of its claims except the breach of contract claim against Huang (Dkt. #38 at pp. 5–6).  Plaintiff's argument is unpersuasive.

As Defendants argue, broad arbitration clauses like the one here "are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Shoebacca, Ltd. v. K-2 Corp.*, 3:17-CV-0473-G, 2017 WL 3115159, at *3 (N.D. Tex. July 21, 2017) (quoting

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998)).  Thus, "it is only necessary that the dispute 'touch' matters covered by the [OEM Agreement] to be arbitrable."  *See Pennzoil*, 139 F.3d at 1068 (citations omitted).  All of Plaintiff's claims here have a significant relationship to the OEM Agreement.

The OEM Agreement establishes Plaintiff's relationship with both Minghui and Minghui's affiliates so that they can manufacture "various electronic portable lighting products (OEM products)" for Plaintiff (Dkt. #33, Exhibit 6).  Additionally, the OEM Agreement explicitly prohibits Minghui and Minghui's affiliates from "sell[ing] into, solicit[ing] orders from, [or] market[ing] (either passively or actively) OEM products into any market worldwide"  (Dkt. #33, Exhibit 6 ¶ 5.3).  The OEM Agreement explicitly lists the following acts as unauthorized sales or marketing:

> 5.3.1 Manufacture OEM products beyond purchase orders;
> 5.3.2 Sell or provide OEM products to any third party through methods including but not limited to below:
> 5.3.2.1 directly;
> 5.3.2.2 via trading company;
> 5.3.2.3 via distributor;
> 5.3.2.4 via Party B's customer; or
> 5.3.2.5 via bidding auctions and trade shows
> 5.3.3 Express that it holds the right to sell or as an agent of Party B;
> 5.3.4 Authorize any third party to sell or as its/Party B's agent to sell the OEM products.
> 5.3.5 Sell products similar in design, form, shape or function to Party B's existing or prospective customers.

(Dkt. #33, Exhibit 6).  Paying attention to the substance of Plaintiff's claims, rather than the label of the claims, confirms that this dispute has a significant relationship to the OEM Agreement:

- By way of example, Bayco discovered (and Minghui acknowledged after questioning by Bayco) that from 2006, Huang (through Minghui) applied for and received nine design patents on Bayco's OEM Products from the Chinese Patent Office (Dkt. #33 ¶ 50);

- The ProTorch Defendants have adopted ornamental designs that are knock-offs to those used by Bayco (Dkt. #33 ¶ 58);

17

- Yet again, Bayco's 8 1/2" clamp light with "Grip-Tite Super Clamp" is identified as "SL-301." Similarly, the ProTorch Defendants' 8 1/2" clamp light with a "Clamp Light with Tight Grip" is identified as "PTC301." The two are shown side-by-side below (Dkt. #33 ⁋ 67);

- Since Mendez was part of the inner circle of Bayco management, he had full detailed knowledge of Bayco's business operations and activities which gave the ProTorch Defendants everything needed to copy Bayco's business model exactly (Dkt. #33 ⁋ 80);

- Mendez's expertise in Bayco's business model and operations combined with Goetz gave the ProTorch Defendants a perfect team to quickly undermine Bayco's business model and undercut Bayco's pricing to secure winning contracts for the ProTorch Defendants (Dkt. #33 ⁋ 81);

- The Defendants, with Defendant Huang and Defendant Goetz and Mendez acting as agents of Defendant ProTorch U.S. and ProTorch China, specifically acquired by improper means, used, and disclosed Bayco's Trade Secrets (Dkt. #33 ⁋ 82);

- [A]t some point in time in an estimated first half of 2018, Goetz secured a sales contract between ProTorch U.S. and Lowe's related to ProTorch products, including clamp lights and cord reels (Dkt. #33 ⁋ 48);

- The ProTorch Defendants used Bayco's confidential information related to Bayco's customers in an unauthorized manner. The ProTorch Defendants used information related to Bayco's customer, Lowe's, to solicit orders from Lowe's by undercutting Bayco's prices (Dkt. #33 ⁋ 168).

Plaintiff's allegations are significantly related to the OEM Agreement and the Agreement's explicit prohibitions on Minghui and Minghui's affiliates' ability to participate in the unauthorized sales or marketing of OEM products.  Plaintiff admits as much in its First Amended Complaint, noting that "all State law claims"—which includes Plaintiff's claim that the OEM Agreement was breached—are "inextricably intertwined with the federal law claims" (Dkt. #33 ⁋ 11).  Plaintiff cannot avoid the Agreement's broad arbitration cause through the cause-of-action labels attached to its allegations.

And this conclusion applies to Goetz & Associates as well.  Although Plaintiff asserts that Goetz  & Associates breached a separate contractual obligation outside of the OEM Agreement, Plaintiff repeatedly refers to Goetz & Associates as an "agent of ProTorch U.S. and ProTorch

China," who: (1) acquired Plaintiff's confidential information in order to secure a sales contract with one of Plaintiff's customers, Lowe's; (2) on behalf of ProTorch U.S., one of Minghui's affiliates under the OEM Agreement; so that (3) ProTorch U.S. could sell its competing OEM products to Lowe's in direct violation of the OEM Agreement (Dkt. #33 ¶¶ 48, 134).  Thus, Plaintiff's claim against Goetz & Associates has a significant relationship to the OEM Agreement's prohibition on "sell[ing] into, solicit[ing] orders from, [or] market[ing] (either passively or actively) OEM products into any market worldwide" (Dkt. #33, Exhibit 6 ¶ 5.3).  And by claiming that Goetz & Associates was acting as an agent of ProTorch U.S.—who is itself Minghui's affiliate for purposes of the OEM Agreement—Plaintiff explicitly places Goetz & Associates within the ambit of the OEM Agreement.  Accordingly, the Court finds that the scope of the arbitration clause covers all of Plaintiff's claims.[7]

### B.  Defendants May Enforce the Arbitration Clause on Estoppel Grounds

The Court also grants Defendants' motion for a second, independent reason: under both direct-benefits estoppel and intertwined-claims estoppel, Defendants may compel arbitration of this dispute.[8]

### i.    Direct-Benefits Estoppel

Under Texas law,[9] "[d]irect benefits estoppel applies when the claim depends on the contract's existence and would be 'unable to stand independently without the contract.'"  *Hays v.*

---

[7] This analysis—concerning what claims are covered by the OEM Agreement's arbitration clause—carries over into the next section regarding estoppel, see *infra* Section II.B., which is predominantly a question of *who* can enforce the clause.

[8] To the extent that the Supreme Court of the United States holds in *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 139 S. Ct. 2776 (2019), that estoppel theories based on domestic law cannot be used by non-signatories to enforce arbitration clauses under the Convention, the Court's analysis regarding the plain language of the OEM Agreement would still result in the Court compelling arbitration under these facts.

[9] Both parties apply Texas law on the question of estoppel.

*HCA Holdings, Inc.*, 838 F.3d 605, 609 (5th Cir. 2016) (citation omitted).  "[W]hether a claim

seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the

claim, not artful pleading."  *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131–32 (Tex. 2005).  If

the claims arise: (1) solely from the contract; or (2) must be determined by reference to the contract,

then the claim is "on the contract."  *Id.* at 132.  When the substance of a claim "arises from general

obligations imposed by state law, including statutes, torts and other common law duties, or federal

law, rather than from contract, direct benefits estoppel does not apply, even if the claim refers to

or relates to the contract."  *Hays*, 838 F.3d at 609 (quoting *G.T. Leach Builders, LLC v. Sapphire

V.P., LP*, 458 S.W.3d 502, 519 (Tex. 2015)) (quotation marks omitted).

But if a litigant pursues even a single claim "'on the contract,' then [it] must pursue all

claims—tort and contract—in arbitration."  *Weekley Homes*, 180 S.W.3d at 132 & n.25 (citing

*Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992), for the proposition that a DTPA

claim that was factually intertwined with a contract claim was subject to the contract's arbitration

clause).  This rule is grounded in equity: if a party wants to avoid a valid arbitration clause, it must

waive claims on the contract that it may be entitled to but that would invoke arbitration.  *See id.* at

132.

Here, Plaintiff brings a breach of contract claim.  Plaintiff's First Amended Complaint

alleges that Defendant Huang breached the OEM Agreement (Dkt. #33 ¶¶ 99–100).  Under a plain

application of the rule from *Weekley Homes*, then, Plaintiff must pursue all claims in arbitration.

*Id.*  Plaintiff resists this natural conclusion, essentially arguing that although it could have brought

*more* breach of contract claims, it chose to rely on other sources of law and, making direct-benefits

estoppel inapplicable (Dkt. #38 at p. 6).  But then, Plaintiff concedes—as it must—that it *did* assert

a breach of the OEM Agreement against Defendant Huang (Dkt. #38 at p. 6 n.6).  "[E]quity does

not allow a party to 'seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.'" *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006) (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)). Yet that is exactly what Plaintiff tries to do here. Under direct-benefits estoppel, Defendants may compel arbitration here.[10]

### ii.   Intertwined-Claims Estoppel

As Plaintiff correctly recognizes, the Supreme Court of Texas has not yet held that intertwined-claims estoppel is a valid theory of estoppel (Dkt. #38 at pp. 4–5). But in *Hays*, the Fifth Circuit made an *Erie* guess that the Supreme Court of Texas would adopt intertwined-claims estoppel if presented with the question. 838 F.3d at 610–12. So, until told otherwise by the Supreme Court of Texas, this Court will apply the doctrine of intertwined-claims estoppel to "dismiss 'strategic pleading' that seeks to avoid arbitration." *Id.* at 610 (quoting *In re Merrill Lynch*, 235 S.W.3d at 194). Such is the case here.

Intertwined-claims estoppel contemplates "compel[ing] arbitration when a nonsignatory defendant has a 'close relationship' with one of the signatories and the claims are 'intimately founded in and intertwined with the underlying contract obligations.'" *Id.* (quoting *In re Merrill Lynch*, 235 S.W.3d at 193–94) (alteration in original). This theory of estoppel applies when "there is a 'tight relatedness of the parties, contracts, and controversies.'" *Id.* (quoting *JLM Indus., Inc.*

---

[10] Plaintiff also argues that Defendants cannot rely on theories of estoppel for arbitration clauses governed by the Convention, citing to *Outokumpu Stainless USA, LLC v. Converteam SAS*, 902 F.3d 1316 (11th Cir. 2018), *cert. granted sub nom. GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 139 S. Ct. 2776, 204 L. Ed. 2d 1156 (2019) (Dkt. #38 at p. 6). As already addressed by the Court, *Outokumpu* does not represent the law within the Fifth Circuit. *See supra* Part II; *Outokumpu*, 902 F.3d at 1325–26 (citing *Sphere Drake Ins. PLC v. Marine Towing, Inc.*, 16 F.3d 666 (5th Cir. 1994), as a counterexample to the Eleventh Circuit's holding that a non-signatory cannot enforce arbitration clauses governed by the Convention). And the Supreme Court has not yet released its decision in that case.

*v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004)).  And it applies to "to prevent signatories to an arbitration agreement from avoiding arbitration simply by suing 'nonsignatory principals or agents for pulling the strings.'"  *Id.* at 611 (quoting *In re Merrill Lynch*, 235 S.W.3d at 194).

The Court finds that Defendants—non-signatories to the OEM Agreement—have a close relationship with Minghui, a signatory to the Agreement.  First, Plaintiff does not seriously dispute, with the exception of Goetz & Associates, that all Defendants are affiliates of Minghui (Dkt. #38 at p. 4).  Nor could Plaintiff: Huang is the president and owner of Minghui; Huang is also the controlling shareholder of ProTorch U.S. and ProTorch China, both of which are affiliates of Minghui involved with Minghui's responsibilities under the OEM Agreement (Dkt. #37 at p. 21).  *See supra* Section II.A.i.  And though Plaintiff claims in its response that Goetz & Associates is an independent contractor, Plaintiff labeled Goetz & Associates an agent of Defendant ProTorch U.S. and Defendant ProTorch China in Plaintiff's Amended Complaint (Dkt. #33 ¶¶ 5, 82).  *See supra* Section II.A.i.  All Defendants have a close relationship with Minghui, a signatory to the OEM Agreement.

 And the Court concludes that Plaintiff's claims are intertwined with the underlying obligations imposed by the OEM Agreement.  Plaintiff *admits* as much in its First Amended Complaint, noting that "all State law claims"—which includes Plaintiff's breach of contract claim—are inextricably intertwined with the federal law claims (Dkt. #33 ¶ 11).[11]  Additionally, all of Plaintiff's claims relate to the contractual obligation imposed on Minghui and its affiliates to refrain from any "unauthorized sales or marking" of OEM products (Dkt. #33, Exhibit 6, Section V).  Because there is a "tight relatedness of the parties, contracts, and controversies," intertwined-

---

[11] Plaintiff also accedes that intertwined-benefits estoppel "presents a close[] issue" here—though certainly not a concession, the Court notes the hesitancy in Plaintiff's argument (Dkt. #46 at p. 5).

claims estoppel allows Defendants to compel arbitration under the OEM Agreement.  *See Hays* 838 F.3d at 612–13.

**III.    Dismissal is Appropriate**

Courts within the Fifth Circuit may dismiss a case when all claims are or must be submitted to arbitration.  *Griggs v. S.G.E. Mgmt., L.L.C.*, 905 F.3d 835, 839 (5th Cir. 2018); *see also Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when *all* of the issues raised in the district court must be submitted to arbitration.") (emphasis in original).  The Fifth Circuit has not decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause.  *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 n.2 (5th Cir. 2010).  However, the Fifth Circuit has "accepted Rule 12(b)(3) as a proper method for dismissal" in this context.  *Id.*

As the Court explained above, all Plaintiff's claims are subject to the OEM Agreement's arbitration clause for two independent reasons.  Accordingly, the Court dismisses Plaintiff's claims under Rule 12(b)(3).

**CONCLUSION**

It is therefore **ORDERED** that Defendants' First Amended Motion to Dismiss the Case and Compel Arbitration (Dkt. #37) is hereby **GRANTED**.  Plaintiff's claims are hereby **DISMISSED without prejudice**.

It is further **ORDERED** that Defendants' Motion to Stay Case Pending Resolution of Defendants' Motion to Compel Arbitration and Dismiss (Dkt. #25) and Plaintiff's Emergency Motion for Anti-Suit Injunction Against Defendants Proceeding with Chinese Arbitration (Dkt. #39) are **DENIED as moot**.

All relief not previously granted is hereby **DENIED**.  The Clerk is directed to close this civil action.

**IT IS SO ORDERED**.

 **SIGNED this 21st day of May, 2020.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE